UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

DAVID STRATTON,

        Petitioner,

v.                                        Case No. 3:17-cv-962-J-34JRK

SECRETARY, FLORIDA
DEPARTMENT OF CORRECTIONS,
et al.,

        Respondents.

_____

## ORDER

### I. Status

Petitioner David Stratton, an inmate of the Florida penal system, initiated this action on August 30, 2017,[1] by filing a Petition for Writ of Habeas Corpus Under 28 U.S.C. § 2254 (Petition; Doc. 1). In the Petition, Stratton challenges a 2008 state court (Duval County, Florida) judgment of conviction for first-degree murder and tampering with evidence. Stratton raises four grounds for relief. See Petition at 4-12.[2] Respondents initially moved to dismiss the Petition as untimely, but the Court denied the motion to dismiss and directed Respondents to file a response on the merits. See Docs. 11; 12. Thereafter, Respondents submitted an answer in opposition to the Petition. See Amended Answer in Response to Order to Show Cause (Response; Doc. 22) with exhibits (Resp. Ex.). Stratton filed a brief in reply. See Second Amended Reply to State's Amended

---

[1] See Houston v. Lack, 487 U.S. 266, 276 (1988) (mailbox rule).
[2] For purposes of reference, the Court will cite the page number assigned by the Court's electronic docketing system.

Answer in Response to an Order to Show Cause (Reply; Doc. 46). This case is ripe for review.

## II. Relevant Procedural History

On January 10, 2008, the State of Florida (State) indicted Stratton on one count of first-degree murder (count one) and one count of tampering with evidence (count two). Resp. Ex. A at 34. Stratton proceeded to trial, at the conclusion of which the jury found him guilty as charged on both counts. Id. at 98-99. On May 23, 2008, the circuit court sentenced Stratton to a minimum mandatory term of incarceration of life in prison as to count one and five years in prison as to count two. Id. at 124-30. The circuit court ordered the sentence imposed on count two to run concurrently with Stratton's life sentence. Id. at 128.

Stratton appealed the convictions and sentences to Florida's First District Court of Appeal (First DCA). Id. at 151. In his initial brief, Stratton, with the assistance of counsel, alleged that the circuit court erred when it denied (1) his motion to suppress physical evidence; and (2) his motion for judgment of acquittal. Resp. Ex. G. The State filed an answer brief, Resp. Ex. H, and Stratton filed a reply brief. Resp. Ex. I. On December 14, 2009, the First DCA per curiam affirmed the convictions and sentences without issuing a written opinion and issued the Mandate on December 30, 2009. Resp. Ex. J.

On March 9, 2011, again with the assistance of counsel, Stratton filed a motion for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.850 (Rule 3.850 Motion). Resp. Ex. K at 1-25. In the Rule 3.850 Motion, Stratton alleged his trial counsel was ineffective because he failed to: (1) produce admissible evidence that would have established that the witnesses could not have identified him; and (2) cross examine a

State's witness regarding the lighting conditions at the scene of the crime. Id. While his Rule 3.850 Motion was pending, Stratton's postconviction counsel died, id. at 32, and, thereafter, Stratton filed three amended pro se motions pursuant to Rule 3.850 (Amended Rule 3.850 Motions). The Amended Rule 3.850 Motions realleged the two claims raised in the Rule 3.850 Motion and added the following two claims that alleged counsel was ineffective for failing to: (1) raise the issue of evidence discovered but not collected by investigators; and (2) have a couch inside Stratton's home tested for deoxyribonucleic acid (DNA). Id. at 34-110. The circuit court denied the two claims Stratton initially raised in his Rule 3.850 Motion on the merits and denied the remaining claims as untimely. Id. at 111-20. On July 27, 2017, the First DCA per curiam affirmed the denial of Stratton's postconviction motions without a written opinion and issued the Mandate on August 25, 2017. Resp. Ex. M.

On April 14, 2016, Stratton filed a pro se motion requesting DNA testing pursuant to Florida Rule of Criminal Procedure 3.853 (Rule 3.853 Motion), in which he sought to have the victim's fingernail clippings tested for DNA. Resp. Ex. N. The circuit court denied the motion on April 7, 2017. Resp. Ex. O. On October 4, 2019, following a belated appeal, the First DCA per curiam affirmed the denial of the Rule 3.853 Motion without issuing a written opinion. See Stratton v. State, 281 So. 3d 452 (Fla. 1st DCA 2019).

### III. One-Year Limitations Period

This proceeding was timely filed within the one-year limitations period. See 28 U.S.C. § 2244(d).

## IV. Evidentiary Hearing

In a habeas corpus proceeding, the burden is on the petitioner to establish the need for a federal evidentiary hearing. See Chavez v. Sec'y, Fla. Dep't of Corr., 647 F.3d 1057, 1060 (11th Cir. 2011). "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." Schriro v. Landrigan, 550 U.S. 465, 474 (2007); Jones v. Sec'y, Fla. Dep't of Corr., 834 F.3d 1299, 1318-19 (11th Cir. 2016), cert. denied, 137 S. Ct. 2245 (2017). "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." Schriro, 550 U.S. at 474. The pertinent facts of this case are fully developed in the record before the Court. Because the Court can "adequately assess [Stratton's] claim[s] without further factual development," Turner v. Crosby, 339 F.3d 1247, 1275 (11th Cir. 2003), an evidentiary hearing will not be conducted.

## V. Governing Legal Principles

### A. Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs a state prisoner's federal petition for habeas corpus. See Ledford v. Warden, Ga. Diagnostic & Classification Prison, 818 F.3d 600, 642 (11th Cir. 2016), cert. denied, 137 S. Ct. 1432 (2017). "'The purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction.'" Id. (quoting Greene v. Fisher, 565 U.S. 34, 38 (2011) (quotation marks omitted)). As such, federal habeas review of final state court

decisions is "'greatly circumscribed' and 'highly deferential.'" Id. (quoting Hill v. Humphrey, 662 F.3d 1335, 1343 (11th Cir. 2011) (quotation marks omitted)).

The first task of the federal habeas court is to identify the last state court decision, if any, that adjudicated the claim on the merits. See Marshall v. Sec'y, Fla. Dep't of Corr., 828 F.3d 1277, 1285 (11th Cir. 2016). The state court need not issue a written opinion explaining its rationale in order for the state court's decision to qualify as an adjudication on the merits. See Harrington v. Richter, 562 U.S. 86, 100 (2011). Where the state court's adjudication on the merits is unaccompanied by an explanation, the United States Supreme Court has instructed:

> [T]he federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning.

Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018). The presumption may be rebutted by showing that the higher state court's adjudication most likely relied on different grounds than the lower state court's reasoned decision, such as persuasive alternative grounds that were briefed or argued to the higher court or obvious in the record it reviewed. Id. at 1192, 1196.

If the claim was "adjudicated on the merits" in state court, § 2254(d) bars relitigation of the claim unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Richter, 562 U.S. at 97-98. The Eleventh Circuit describes the limited scope of federal review pursuant to § 2254 as follows:

First, § 2254(d)(1) provides for federal review for claims of state courts' erroneous legal conclusions. As explained by the Supreme Court in Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 146 L.Ed.2d 389 (2000), § 2254(d)(1) consists of two distinct clauses: a "contrary to" clause and an "unreasonable application" clause. The "contrary to" clause allows for relief only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Id. at 413, 120 S. Ct. at 1523 (plurality opinion). The "unreasonable application" clause allows for relief only "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id.

Second, § 2254(d)(2) provides for federal review for claims of state courts' erroneous factual determinations. Section 2254(d)(2) allows federal courts to grant relief only if the state court's denial of the petitioner's claim "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The Supreme Court has not yet defined § 2254(d)(2)'s "precise relationship" to § 2254(e)(1), which imposes a burden on the petitioner to rebut the state court's factual findings "by clear and convincing evidence." See Burt v. Titlow, 571 U.S. ---, ---, 134 S. Ct. 10, 15, 187 L.Ed.2d 348 (2013); accord Brumfield v. Cain, 576 U.S. ---, ---, 135 S. Ct. 2269, 2282, 192 L.Ed.2d 356 (2015). Whatever that "precise relationship" may be, "'a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'"[3] Titlow, 571 U.S. at ---, 134 S. Ct. at 15 (quoting Wood v. Allen, 558 U.S. 290, 301, 130 S. Ct. 841, 849, 175 L.Ed.2d 738 (2010)).

Tharpe v. Warden, 834 F.3d 1323, 1337 (11th Cir. 2016), cert. denied, 137 S. Ct. 2298

(2017). Also, deferential review under § 2254(d) generally is limited to the record that was

---

[3] The Eleventh Circuit has described the interaction between § 2254(d)(2) and § 2254(e)(1) as "somewhat murky." Clark v. Att'y Gen., Fla., 821 F.3d 1270, 1286 n.3 (11th Cir. 2016), cert. denied, 137 S. Ct. 1103 (2017).

before the state court that adjudicated the claim on the merits. See Cullen v. Pinholster, 563 U.S. 170, 182 (2011) (stating the language in § 2254(d)(1)'s "requires an examination of the state-court decision at the time it was made").

Thus, "AEDPA erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." Burt v. Titlow, 134 S. Ct. 10, 16 (2013). "Federal courts may grant habeas relief only when a state court blundered in a manner so 'well understood and comprehended in existing law' and 'was so lacking in justification' that 'there is no possibility fairminded jurists could disagree.'" Tharpe, 834 F.3d at 1338 (quoting Richter, 562 U.S. at 102-03). This standard is "meant to be" a "difficult" one to meet. Richter, 562 U.S. at 102. Thus, to the extent that the petitioner's claims were adjudicated on the merits in the state courts, they must be evaluated under 28 U.S.C. § 2254(d).

### B. Exhaustion/Procedural Default

There are prerequisites to federal habeas review. Before bringing a § 2254 habeas action in federal court, a petitioner must exhaust all state court remedies that are available for challenging his state conviction. See 28 U.S.C. § 2254(b)(1)(A). To exhaust state remedies, the petitioner must "fairly present[]" every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review. Castille v. Peoples, 489 U.S. 346, 351 (1989) (emphasis omitted). Thus, to properly exhaust a claim, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999).

In addressing exhaustion, the United States Supreme Court explained:

> Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b)(1), thereby giving the State the "'"opportunity to pass upon and correct" alleged violations of its prisoners' federal rights.'" Duncan v. Henry, 513 U.S. 364, 365, 115 S. Ct. 887, 130 L.Ed.2d 865 (1995) (per curiam) (quoting Picard v. Connor, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L.Ed.2d 438 (1971)). To provide the State with the necessary "opportunity," the prisoner must "fairly present" his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim. Duncan, supra, at 365-366, 115 S. Ct. 887; O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L.Ed.2d 1 (1999).

Baldwin v. Reese, 541 U.S. 27, 29 (2004).

A state prisoner's failure to properly exhaust available state remedies results in a procedural default which raises a potential bar to federal habeas review. The United States Supreme Court has explained the doctrine of procedural default as follows:

> Federal habeas courts reviewing the constitutionality of a state prisoner's conviction and sentence are guided by rules designed to ensure that state-court judgments are accorded the finality and respect necessary to preserve the integrity of legal proceedings within our system of federalism. These rules include the doctrine of procedural default, under which a federal court will not review the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule. See, e.g., Coleman,[4] supra, at 747–748, 111 S. Ct. 2546; Sykes,[5] supra, at 84–85, 97 S. Ct. 2497. A state court's invocation of a procedural rule to deny a prisoner's claims precludes federal review of the claims if, among other requisites, the state procedural rule is a nonfederal ground adequate to support the judgment and the rule is firmly established and consistently followed. See, e.g., Walker v. Martin, 562 U.S. --, --, 131 S. Ct. 1120, 1127–1128, 179 L.Ed.2d 62 (2011); Beard v. Kindler, 558 U.S. --, --, 130 S. Ct. 612, 617–618, 175 L.Ed.2d 417 (2009). The doctrine barring procedurally defaulted claims from being heard is not without

---

[4] Coleman v. Thompson, 501 U.S. 722 (1991).
[5] Wainwright v. Sykes, 433 U.S. 72 (1977).

> exceptions. A prisoner may obtain federal review of a
> defaulted claim by showing cause for the default and
> prejudice from a violation of federal law. See Coleman, 501
> U.S., at 750, 111 S. Ct. 2546.

Martinez v. Ryan, 132 S. Ct. 1309, 1316 (2012). Thus, procedural defaults may be

excused under certain circumstances. Notwithstanding that a claim has been procedurally

defaulted, a federal court may still consider the claim if a state habeas petitioner can show

either (1) cause for and actual prejudice from the default; or (2) a fundamental miscarriage

of justice. Ward v. Hall, 592 F.3d 1144, 1157 (11th Cir. 2010). In order for a petitioner to

establish cause,

> the procedural default "must result from some objective factor
> external to the defense that prevented [him] from raising the
> claim and which cannot be fairly attributable to his own
> conduct." McCoy v. Newsome, 953 F.2d 1252, 1258 (11th Cir.
> 1992) (quoting Carrier, 477 U.S. at 488, 106 S. Ct. 2639).[6]
> Under the prejudice prong, [a petitioner] must show that "the
> errors at trial actually and substantially disadvantaged his
> defense so that he was denied fundamental fairness." Id. at
> 1261 (quoting Carrier, 477 U.S. at 494, 106 S. Ct. 2639).

Wright v. Hopper, 169 F.3d 695, 706 (11th Cir. 1999).

In the absence of a showing of cause and prejudice, a petitioner may receive

consideration on the merits of a procedurally defaulted claim if the petitioner can establish

that a fundamental miscarriage of justice, the continued incarceration of one who is

actually innocent, otherwise would result. The Eleventh Circuit has explained:

> [I]f a petitioner cannot show cause and prejudice, there
> remains yet another avenue for him to receive consideration
> on the merits of his procedurally defaulted claim. "[I]n an
> extraordinary case, where a constitutional violation has
> probably resulted in the conviction of one who is actually
> innocent, a federal habeas court may grant the writ even in
> the absence of a showing of cause for the procedural default."
> Carrier, 477 U.S. at 496, 106 S. Ct. at 2649. "This exception

---

[6] Murray v. Carrier, 477 U.S. 478 (1986).

is exceedingly narrow in scope," however, and requires proof of actual innocence, not just legal innocence. Johnson v. Alabama, 256 F.3d 1156, 1171 (11th Cir. 2001).

Ward, 592 F.3d at 1157. "To meet this standard, a petitioner must 'show that it is more likely than not that no reasonable juror would have convicted him' of the underlying offense." Johnson v. Alabama, 256 F.3d 1156, 1171 (11th Cir. 2001) (quoting Schlup v. Delo, 513 U.S. 298, 327 (1995)). Additionally, "'[t]o be credible,' a claim of actual innocence must be based on reliable evidence not presented at trial." Calderon v. Thompson, 523 U.S. 538, 559 (1998) (quoting Schlup, 513 U.S. at 324). With the rarity of such evidence, in most cases, allegations of actual innocence are ultimately summarily rejected. Schlup, 513 U.S. at 324.

## C. Ineffective Assistance of Trial Counsel

"The Sixth Amendment guarantees criminal defendants the effective assistance of counsel. That right is denied when a defense attorney's performance falls below an objective standard of reasonableness and thereby prejudices the defense." Yarborough v. Gentry, 540 U.S. 1, 5 (2003) (per curiam) (citing Wiggins v. Smith, 539 U.S. 510, 521 (2003), and Strickland v. Washington, 466 U.S. 668, 687 (1984)).

> To establish deficient performance, a person challenging a conviction must show that "counsel's representation fell below an objective standard of reasonableness." [Strickland,] 466 U.S. at 688, 104 S. Ct. 2052. A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance. Id., at 689, 104 S. Ct. 2052. The challenger's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id., at 687, 104 S. Ct. 2052.
>
> With respect to prejudice, a challenger must demonstrate "a reasonable probability that, but for counsel's unprofessional

10

> errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id., at 694, 104 S. Ct. 2052. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." Id., at 693, 104 S. Ct. 2052. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id., at 687, 104 S. Ct. 2052.

Richter, 562 U.S. at 104. The Eleventh Circuit has recognized "the absence of any iron-clad rule requiring a court to tackle one prong of the Strickland test before the other." Ward, 592 F.3d at 1163. Since both prongs of the two-part Strickland test must be satisfied to show a Sixth Amendment violation, "a court need not address the performance prong if the petitioner cannot meet the prejudice prong, and vice-versa." Id. (citing Holladay v. Haley, 209 F.3d 1243, 1248 (11th Cir. 2000)). As stated in Strickland: "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Strickland, 466 U.S. at 697.

A state court's adjudication of an ineffectiveness claim is accorded great deference.

> "[T]he standard for judging counsel's representation is a most deferential one." Richter, - U.S. at -, 131 S. Ct. at 788. But "[e]stablishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. The standards created by Strickland and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." Id. (citations and quotation marks omitted). "The question is not whether a federal court believes the state court's determination under the Strickland standard was incorrect but whether that determination was unreasonable - a substantially higher threshold." Knowles v. Mirzayance, 556 U.S. 111, 123, 129 S. Ct. 1411, 1420, 173 L.Ed.2d 251 (2009) (quotation marks omitted). If there is "any reasonable argument that counsel satisfied Strickland's deferential standard," then a federal court may not disturb a state-court

> decision denying the claim. <u>Richter</u>, - U.S. at -, 131 S. Ct. at 788.

<u>Hittson v. GDCP Warden</u>, 759 F.3d 1210, 1248 (11th Cir. 2014); <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 123 (2009). In other words, "[i]n addition to the deference to counsel's performance mandated by <u>Strickland</u>, the AEDPA adds another layer of deference--this one to a state court's decision--when we are considering whether to grant federal habeas relief from a state court's decision." <u>Rutherford v. Crosby</u>, 385 F.3d 1300, 1309 (11th Cir. 2004). As such, "[s]urmounting <u>Strickland</u>'s high bar is never an easy task." <u>Padilla v. Kentucky</u>, 559 U.S. 356, 371 (2010).

## VI. Findings of Fact and Conclusions of Law

### A. Grounds One and Two

As Ground One, Stratton alleges that his trial counsel was ineffective for failing to present photographic evidence and documentation from the apartment complex that would have demonstrated the poor lighting conditions at time of the murder. Petition at 4-5. Stratton maintains this evidence would have contradicted the identification testimony of the sole eye witness, Beverly Keaton. Similarly, in Ground Two, Stratton asserts that his counsel was deficient for failing to cross examine Keaton and the other witnesses, both civilian and law enforcement, concerning the limited lighting conditions at the apartment complex at the time of the murder. <u>Id.</u> at 6-7. Stratton contends that the State had only one witness, Keaton, who identified him as a participant in the murder. <u>Id.</u> at 4-7. According to Stratton, cross examining the witnesses and producing evidence concerning the lighting conditions would have cast doubt on the reliability of Keaton's testimony and demonstrated that Keaton misidentified him. <u>Id.</u> But for Keaton's testimony, Stratton asserts that he would not have been found guilty because he never confessed,

and no physical evidence linked Stratton to the "out laying scene of the crime." Id. As such, Stratton argues that further cross examination and the production of evidence on this matter would have undermined Keaton's testimony and resulted in his acquittal. Id.

Stratton raised these claims in his Rule 3.850 Motions. Resp. Ex. K at 104-07. In denying both of these claims, the circuit court explained:

> It is clear from the record that counsel elicited testimony regarding the lighting conditions and contested the only eyewitness testimony, presented through Keaton, by creating doubt about her ability to see the crime and perpetrators. Defense counsel argued in both opening and closing statements that Keaton was unable to make a reliable identification. This argument was prevalent enough that the State noted counsel's argument in her closing and rebuttal arguments. During trial, counsel elicited testimony from multiple state witnesses regarding this issue to support his argument.

> During the direct examination of Keaton, Keaton stated she heard a female voice, but could not see the woman 'because she was in the dark." However, Keaton testified the lighting out in the courtyard where the crime took place was "good" and sufficient enough to "see and distinguish." On cross examination, counsel obtained testimony from Keaton that there were no lights in the courtyard; instead, lights on the apartment buildings illuminate onto the courtyard. Counsel elicited testimony that the crime occurred between 3:30 a.m. and 4 a.m., but that police did not take pictures from her apartment to show the lighting conditions at that point, nor did they measure the distance from her apartment to the courtyard. On cross examination, Keaton admitted she was not able to see the faces of anyone in the courtyard that night. Counsel further elicited testimony that, because of the darkness, she could not see under a tree that was closer to her apartment than the courtyard and that the light on one of the apartment buildings had burnt out and was not operational.

> In addition to the cross examination of Keaton, counsel questioned Detective Patrick Bodine ("Detective Bodine"), a homicide detective with the Jacksonville Sheriff's Office ("JSO"), regarding this issue. Detective Bodine testified he did

not instruct evidence technicians to take photographs from Keaton's bedroom window between 3:30 a.m. and 4 a.m. or measure the distance from her window to the spot she states she saw Defendant in the courtyard. Additionally, counsel asked the crime scene investigator if the detective had instructed her to take photographs out of Keaton's window or measure the distance from her apartment to the courtyard, to which she responded in the negative.

The cross examination of the other state witnesses on this topic would have likely been inadmissible. See § 90.612(2), Fla. Stat. (2008) ("Cross-examination of a witness is limited to the subject matter of the direct examination and matters affecting the credibility of the witness."). Moreover, the presentation of evidence of the lighting conditions at the crime scene would have undermined counsel's argument that the police did not conduct an adequate investigation with respect to Keaton's testimony. Moreover, any testimony from the investigator or apartment complex manager regarding the lighting conditions at the time of the offense would have been cumulative to Keaton's testimony. See Jones v. State, 998 So. 2d 573, 586 (Fla. 2008) ("We have repeatedly held that counsel is not ineffective for failing to present cumulative evidence."). Any testimony regarding lighting conditions after the crime would be irrelevant and, thus, inadmissible. Lastly, after the State's presentation of evidence, this Court conducted a colloquy with Defendant in which Defendant stated he believed counsel adequately investigated all defenses and all witnesses on Defendant's behalf. Therefore, this Court does not find counsel was ineffective for failing to present evidence of the lighting conditions of the crime scene or failing to conduct further cross examination on the subject.

Assuming *arguendo* that counsel was ineffective for these failures, this Court finds Defendant still cannot show prejudice. At trial, the State presented evidence of Defendant's guilt. Keaton testified she saw Defendant and another male dragging the victim in the courtyard and that she saw Defendant hit the victim with a "silver object." Melvin Sumpter ("Melvin") testified he was at Defendant's house on the night of the incident, drinking with a number of people, including the victim. Melvin testified the victim become [sic] inebriated to the point he vomited and passed out. Melvin stated the victim vomited on Defendant's bed and that Defendant became upset. Melvin left the apartment to get food and asked Defendant to watch the victim, who remained

passed out in Defendant's bedroom. At the time Melvin left, [neither] Defendant nor the victim were injured. When Melvin returned approximately an hour later, the victim was missing, and when asked where he was, Defendant stated the victim had gotten up and left. Melvin noticed Defendant's hand was cut and that he was acting "nervously as if something was wrong." Melvin's brother, Michael Sumner [sic] ("Michael"), also noticed Defendant's injury and nervous behavior.

Michael testified Defendant eventually stated, "I wasn't the one who kept stabbing him." Michael then noticed drag marks starting at Defendant's door, prompting Michael and Melvin to follow the marks and look for the victim. After following the drag marks, Melvin and Michael found one of Kevin's shoes, as well as droplets of blood, which led to a large pool of blood by a dumpster near the edge of the woods. The brothers stopped searching at that point, never entering the woods, and contacted police. At some point, both brothers saw Defendant with a knife in his hand. Melvin saw Defendant walk across the street to the Publix parking lot with the knife, and later, police were able to find a knife in that parking lot.

Officer Troy Blum "("Officer Blum") of JSO testified Michael approached him while on a traffic stop and brought him to the dumpster where Officer Blum noticed a large amount of blood. Officer Blum testified he went into the woods, searching for the victim, and located the victim's dead body. Officer Blum testified after securing the perimeter of the crime scene, Defendant approached him and told Officer Blum he knew what happened, so Officer Blum had him transported to the homicide unit for an interview.

Detective Bobby Bowers ("Detective Bowers") interviewed Defendant, and the State presented a videotape of that interview at trial. Detective Bowers testified Defendant told him the victim had thrown up on his bed and he got mad, so he slapped the victim's face to get him to wake up, but when the victim woke up, a confrontation ensued. Defendant, however, stated that two brothers, Jesse and Joesph [sic] Kozlowski, who were also at Defendant's house, tried to rob the victim, beat him, and drug him out of Defendant's apartment. Detective Bowers testified that despite Defendant's allegations, the victim was found with his wallet and money in his pocket. Detective Bowers noted Defendant gave inconsistent accounts of multiple details during his interview. Defendant also admitted to cleaning up blood after

the incident and taking a knife to the Publix parking lot and leaving it there because he knew police officers were coming.

In light of the evidence against Defendant, this Court finds no reasonable probability that the result of Defendant's trial would have been different but for counsel's failure to present evidence of the lighting conditions and to further cross examine state witnesses on this topic. Defendant is, therefore, not entitled to relief.

Id. at 114-18 (record citations and footnotes omitted). The First DCA per curiam affirmed the denial of relief on these claims without issuing a written opinion. Resp. Ex. M.

To the extent that the First DCA decided the claims on the merits,[7] the Court will address the claims in accordance with the deferential standard for federal court review of state court adjudications. After a review of the record and the applicable law, the Court concludes that the state court's adjudication of these claims was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Thus, Stratton is not entitled to relief on the basis of these claims.

Nevertheless, even if the First DCA's adjudication of the claims is not entitled to deference, the claims in Grounds One and Two are without merit. Concerning Ground One, the Court finds this claim is speculative as Stratton has provided no evidence that would contradict Keaton's testimony concerning the lighting conditions at the time of the incident. Stratton assumes, without evidentiary support, that pictures or unidentified documents would demonstrate Keaton was unable to see with any clarity into the

---

[7] Throughout this order, in looking through the appellate court's per curiam affirmance to the circuit court's "relevant rationale," the Court presumes that the appellate court "adopted the same reasoning." Wilson, 138 S. Ct. at 1194.

courtyard that night. Such speculative and conclusory allegations are insufficient to warrant federal habeas relief. Tejada v. Dugger, 941 F.2d 1551, 1559 (11th Cir. 1991) (recognizing that vague, conclusory, speculative, or unsupported claims cannot support an ineffective assistance of counsel claim). Indeed, Stratton alleges his counsel hired a private investigator to research the lighting conditions and the investigation revealed the apartment complex had subsequently upgraded the lighting in the area following the murder, which demonstrates counsel did investigate this issue. Petition at 4. Moreover, any new pictures would not have been relevant as the lighting conditions had changed from the time the incident had occurred.

As to the claim in Ground Two, the record reflects that counsel cross examined several witnesses concerning the lighting conditions of the courtyard. Counsel elicited responses from Keaton in which she disclosed there were no lamps or lights on in the actual courtyard, but lights from each of the apartment buildings helped to illuminate the area. Resp. Ex. C at 51-52. Keaton further testified on cross examination that law enforcement officers did not take pictures from her window to document the view or measure the distance from her window to the courtyard. Id. at 52. Additionally, during both direct and cross examination, Keaton testified that the light on the apartment building that housed Stratton's individual apartment was not functioning that night and a large tree shaded that area. Id. at 42-44, 61-62. Counsel also cross examined Detectives Patrick Bodine, Lisa Kicklighter, and Bobby Bowers about their failure to take photographs or measure the distance between Keaton's home and the courtyard. Resp. Exs. C at 129-30; D at 220; E at 425. Accordingly, the record refutes Stratton's allegations that counsel failed to cross-examine Keaton and other witnesses concerning the lighting at the scene

of the crime. To the extent Keaton argues counsel should have cross examined additional witnesses on this matter, the Court finds the claim is speculative because Stratton has not, and cannot, know how the witnesses would have testified on this matter.

Moreover, Stratton cannot demonstrate prejudice with regard to either claim. Keaton testified that she did not wear glasses and had no issues with her eyesight. Resp. Ex. C at 35. Keaton knew Stratton as a neighbor and knew in which apartment Stratton lived, but did not know his name. Resp. Exs. C at 36-37; E at 411. According to Keaton, in the early morning hours of January 5, 2007, she heard loud voices outside of her apartment coming from Stratton's apartment. Resp. Ex. C at 39-40. When she looked out the window she observed two males dragging another male into a courtyard area, hitting him with a steel object, and ultimately dragging the victim out of sight towards the dumpster area of the complex. Id. at 40-48. Keaton admitted she could not see faces but testified that the lighting was good enough for her to see and distinguish everyone but a female who was underneath the shade of a large tree. Id. at 43-44, 47. Even though she did not see faces, Keaton testified there was no doubt in her mind that one of the attackers was Stratton because she recognized his muscular build and the fact that Stratton's right arm hung down as if it was hurt. Id. at 47, 58, 67-68. This latter fact is notable because during trial the State presented evidence that Stratton suffered a stroke when he was a baby that caused poor functionality in his right arm. Resp. Ex. D at 299-307.

Two other witnesses, Melvin and Michael Sumpter, both testified that they and the victim were hanging out at Stratton's apartment the night of the murder and had left the victim, who was drunk and throwing up on Stratton's bed, at the apartment while they went to get some food. Resp. Ex. C at 71-86, 103-10. Notably, Melvin Sumpter testified

that neither the victim nor Stratton were injured before they left. Id. at 86, 100. However, when they returned, Stratton had a cut on his hand and was acting nervous. Id. at 89-91, 111-15. Stratton maintained that the victim had simply left. Id. at 90-91, 111. Michael Sumpter asked Stratton why the victim would leave when he was staying at Michael's apartment, to which Stratton spontaneously replied, "I wasn't the one who kept stabbing him." Id. at 112-13. The Sumpter brothers began questioning Stratton concerning the whereabouts of the victim and eventually discovered drag marks and a blood trail leaving Stratton's apartment to the courtyard and from there to the dumpster area. Id. at 87-100, 111-14. After calling the police, the Sumpter brothers again saw Stratton, and this time Stratton was holding a knife in his hand walking away from the apartment complex. Id. at 93, 99, 112-15.

Stratton approached the officers at the scene, stating he had relevant information, so officers transported Stratton to their headquarters for an interview. Id. at 137-39. During the interview, Stratton maintained that Jesse and Joseph Kozlowski, two individuals who were also present at his apartment that night, were the ones who beat, dragged, and murdered the victim. Resp. Ex. E at 320-99. However, Stratton gave various accounts of certain details. For instance, he claimed that he did not know where the Kozlowski brothers took the victim once they left his apartment but slipped up during the interview and explained how the brothers purportedly dragged the victim from the courtyard to the dumpster. Id. at 340-41. Stratton's explanation as to how he cut his hand also had timing discrepancies that varied when he told the story throughout the interview. Id. at 316, 338-39, 342-43, 389. The medical examiner testified that the cut on Stratton's hand was consistent with a person holding a knife, stabbing something hard, and having

the hand slip off the handle onto the blade. Resp. Ex. D at 266-69. According to the medical examiner, the victim was stabbed twenty-one times and had suffered blunt force trauma. Id. at 235-56. Notably, the victim's blood was discovered on the pants Stratton wore during the interview. Resp. Ex. E at 464-65.

In light of Keaton's testimony; witness testimony regarding Stratton's actions, injuries, and behavior; the forensic evidence; and Stratton's own statements to the witnesses and detectives, the Court finds there is no reasonable probability the outcome of the trial would have been different had counsel presented additional evidence or further cross examined the witnesses about the lighting conditions at the apartment complex. Accordingly, for the above stated reasons, Stratton has failed to demonstrate either deficient performance or prejudice. Therefore, he is not entitled to federal habeas relief and the claims in Grounds One and Two are due to be denied.

**B. Ground Three**

As Ground Three, Stratton does not allege any federal constitutional claim but contends that the victim's fingernail clippings were not, but should have been, tested for DNA. Petition at 8-10. According to Stratton, DNA analysis of the clippings would reveal that his DNA would not be present and, therefore, exonerate him of the murder charge. Id. Respondents contend this claim is not cognizable in federal habeas proceedings. Response at 26-33.

To the extent Stratton requests DNA testing, such a claim is properly brought in a civil rights action pursuant to 42 U.S.C. § 1983, this is so because successful DNA testing would not necessarily imply the invalidity of Stratton's conviction. See Skinner v. Switzer, 562 U.S. 521, 534-37 (2011). Pursuant to Rule 3.853, a movant can file a motion for

postconviction DNA testing under sections 925.11 and 925.12, Florida Statutes. Fla. R. Crim. P. 3.853(a). "If the movant is successful, those procedures culminate only in 'the results of the DNA testing ordered by the court [being] provided in writing to the court, the movant, and the prosecuting authority.'" Brown v. Sec'y for Dep't of Corr., 530 F.3d 1335, 1337 (11th Cir. 2008) (citing Fla. R. Crim. P. 3.853 and § 925.11(2)(i), Fla. Stat.). As such, "a Rule 3.853 proceeding involves an application for discovery only, pursuant to which the court lacks authority to order relief from the movant's sentence or conviction based on the DNA test results." Id. Accordingly, "[i]f the movant believes those results provide a basis for a successful collateral attack on his judgment of conviction, he may then institute a proceeding under Florida's collateral attack rules and only in that manner secure such relief." Id. In light of the fact that DNA testing would not change the fact or duration of Stratton's detention, he is not entitled to federal habeas relief. See Skinner, 562 U.S. at 534-37. Moreover, any defect in the Rule 3.853 proceeding would not be a cause for federal habeas relief. See Carroll v. Sec'y, Dep't of Corr., 574 F.3d 1354, 1365 (11th Cir. 2009) ("This Court has repeatedly held defects in state collateral proceedings do not provide a basis for habeas relief."); Spradley v. Dugger, 825 F.2d 1566, 1568 (11th Cir. 1987) (citation omitted) ("Neither the state court's failure to hold a hearing on petitioner's 3.850 motion nor its failure to attach the relevant portions of the record in any way undermines the validity of petitioner's conviction. Because claim (1) goes to issues unrelated to the cause of petitioner's detention, it does not state a basis for habeas relief.").

If Stratton is arguing that the circuit court erred in denying his Rule 3.853 Motion, this claim is likewise not cognizable in a federal habeas petition because it is a matter of

state law. See Swarthout v. Cooke, 562 U.S. 216, 219 (2011) (holding errors of state law are not cognizable in federal habeas review); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); Quince v. Crosby, 360 F.3d 1259, 1261-62 (11th Cir. 2004) ("while habeas relief is available to address defects in a criminal defendant's conviction and sentence, an alleged defect in a collateral proceeding does not state a basis for habeas relief."). The Court notes that there is no substantive due process right to postconviction access to DNA evidence, see Thompson v. Rundle, 393 F. App'x 675, 679 (11th Cir. 2010) (citing Cunningham v. Dist. Atty's Office for Escambia Cnty., 592 F.3d 1237 (11th Cir. 2010)), and Stratton has not asserted any federal constitutional violation in Ground Three. Therefore, his request for DNA testing rests solely on state law and is inappropriate for review in a federal habeas petition. In light of the above analysis, the claim in Ground Three is due to be denied.

### C. Ground Four

Lastly, Stratton contends that the circuit court violated his federal constitutional rights to due process, a fair trial, and effective assistance of counsel when it denied his motion for judgment of acquittal. Petition at 11-12. Stratton maintains that the evidence against him was insufficient to establish beyond a reasonable doubt that he committed the murder. Id. According to Stratton, Keaton's testimony was unreliable and there was no physical evidence linking Stratton to the actual murder. Id. Stratton contends that the DNA evidence demonstrates the Kozlowski brothers, not him, murdered the victim. Id.

The record reflects that Stratton's trial counsel moved for a judgment of acquittal on the basis that the State had failed to prove Stratton was the killer. Resp. Ex. E at 473. The circuit court denied the motion, stating:

> I think they've presented sufficient testimony, one eye witness who, of course, the jury can make the determination whether to believe that witness or not, but they have met their burden of going forward to the jury. So I'll deny the motion for judgment of acquittal.

Id. Counsel moved for a judgment of acquittal on the same ground after the defense rested, which the trial court denied based on the same reasoning. Id. at 482. Stratton raised the denial of his motion for judgment of acquittal on direct appeal. Resp. Ex. G. The First DCA per curiam affirmed the denial of relief on this issue without issuing a written opinion. Resp. Ex. J.

To the extent that the First DCA decided the claim on the merits, the Court will address the claim in accordance with the deferential standard for federal court review of state court adjudications. After a review of the record and the applicable law, the Court concludes that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Thus, Stratton is not entitled to relief on the basis of this claim.

Nevertheless, even if the First DCA's adjudication of this claim is not entitled to deference, the claim in Ground Four is meritless. In reviewing a motion for judgment of acquittal, trial courts must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential

elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Gudinas v. State, 693 So. 2d 953, 962 (Fla. 1997) (quoting Taylor v. State, 583 So. 2d 323, 328 (Fla. 1991) (holding a motion for judgment of acquittal should not be granted unless "there is no view of the evidence which the jury might take favorable to the opposite party that can be sustained under the law.")). The Supreme Court has "made clear that Jackson claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference." Coleman v. Johnson, 566 U.S. 650, 651 (2012). In particular, the Supreme Court explained:

> First, on direct appeal, it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury. And second, on habeas review, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was objectively unreasonable.

Id. (citations and quotations omitted). "[T]he only question under Jackson is whether [the jury's] finding was so insupportable as to fall below the threshold of bare rationality," and the state court's determination that it was not "in turn is entitled to considerable deference under AEDPA." Preston v. Sec'y, Fla. Dep't of Corr., 785 F.3d 449, 463 (11th Cir. 2015) (quoting Coleman, 650 U.S. at 656).

As noted above in the Court's analysis of Grounds One and Two, the State presented sufficient evidence against Stratton. Regarding the identification element, Keaton testified that although she could not make out faces, she had no doubt in her mind that Stratton participated in the murder because she recognized his muscular frame and the fact that his right arm looked as if it was hurt. Resp. Ex. C at 36, 43-44, 47, 58, 67-68.

The State also introduced evidence that Stratton's right arm did not function properly due to a stroke he suffered as a baby, which corroborated Keaton's eye-witness testimony. Resp. Ex. D at 306-07, 339-40. Moreover, as detailed above, Stratton made incriminating statements to one of the witnesses and during his interview with police. Also, the victim's blood was found on the pants Stratton wore in the interview that occurred within twenty-four hours of the murder. Resp. Ex. E at 464-65. Evidence of the victim's blood on Stratton's clothes is particularly incriminating in light of the fact that he told detectives during the interrogation that he never touched the victim other than slapping the victim a few times to wake him up from a drunken sleep. Resp. Ex. D at 336, 347. This evidence was sufficient to send the case to the jury. Stratton's contentions regarding Keaton's testimony is a matter for the jury decide, not a trial court considering a motion for judgment of acquittal, because it is an issue of credibility. See Fitzpatrick v. State, 900 So. 2d 495, 508 (Fla. 2005) (noting that the existence of contradictory, conflicting testimony or evidence "does not warrant a judgment of acquittal because the weight of the evidence and the witnesses' credibility are questions solely for the jury."). Stratton has failed to establish that there is no view of the evidence which the jury might have taken favorable to the State's position nor that the state court's decision rejecting his sufficiency of the evidence claim was objectively unreasonable. See Coleman, 566 U.S. at 651; Jackson, 443 U.S. at 319; Gudinas, 693 So. 2d at 962. Accordingly, Stratton's claim in Ground Four is due to be denied.

## VII. Certificate of Appealability

## Pursuant to 28 U.S.C. § 2253(c)(1)

If Stratton seeks issuance of a certificate of appealability, the undersigned opines that a certificate of appealability is not warranted. The Court should issue a certificate of appealability only if the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make this substantial showing, Stratton "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further,'" Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)).

Where a district court has rejected a petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. See Slack, 529 U.S. at 484. However, when the district court has rejected a claim on procedural grounds, the petitioner must show that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Id. Upon consideration of the record as a whole, the Court will deny a certificate of appealability.

Therefore, it is now

**ORDERED AND ADJUDGED:**

1.      The Petition (Doc. 1) is **DENIED**, and this action is **DISMISSED WITH PREJUDICE**.

2.      The Clerk of the Court shall enter judgment denying the Petition and dismissing this case with prejudice.

3.      If Stratton appeals the denial of the Petition, the Court denies a certificate of appealability. Because the Court has determined that a certificate of appealability is not warranted, the Clerk shall terminate from the pending motions report any motion to proceed on appeal as a pauper that may be filed in this case. Such termination shall serve as a denial of the motion.

4.      The Clerk of the Court is directed to close this case and terminate any pending motions.

**DONE AND ORDERED** at Jacksonville, Florida, this 7th day of April, 2020.

MARCIA MORALES HOWARD
United States District Judge

Jax-8

C:      David Stratton #J32700
        Counsel of record